SBK:SLT
F.# 2006R01851

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

M-07- 208

- - - - - - - - - - - - - - - - -X

UNITED STATES OF AMERICA

    - against -

GERALDO HUERTAS,
  also known as "Big Jay,"
JOSE OCASIO SR.,
  also known as "Lil Jay," and
JONATHAN RODRIGUEZ,
  also known as "Mil,"

        Defendants.

TO BE FILED UNDER SEAL

AFFIDAVIT IN SUPPORT
OF APPLICATION FOR
ARREST WARRANTS

(18 U.S.C.
§§ 922(a)(1)(A) and 2;
and 21 U.S.C. §§
841(a)(1),
(b)(1)(B)(iii))

- - - - - - - - - - - - - - - - -X

EASTERN DISTRICT OF NEW YORK, SS:

       MICHAEL PARTEN, being duly sworn, deposes and says that he is a Special Agent with the Bureau of Alcohol, Tobacco, Firearms, and Explosives ("ATF"), duly appointed according to law and acting as such.

       Upon information and belief, on or about and between January 17, 2005 and June 16, 2005, within the Eastern District of New York and elsewhere, the defendants GERALDO HUERTAS, also known as "Big Jay," JOSE OCASIO SR., also known as "Lil Jay," and JONATHAN RODRIGUEZ, also known as "Mil," not being licensed importers, manufacturers, or dealers in firearms, did knowingly and willfully engage in the business of dealing in firearms.

       (Title 18, United States Code, Sections 922(a)(1)(A) and 2.)

       Upon information and belief, on or about June 16, 2005, within the Eastern District of New York, the defendant GERALDO

HUERTAS, also known as "Big Jay," did knowingly and intentionally distribute and possess with intent to distribute a controlled substance, which offense involved five grams or more of a substance containing cocaine base, a Schedule II controlled substance.

(Title 21, United States Code, Sections 841(a)(1) and 841(b)(1)(B)(iii).)

The source of your deponent's information and the grounds for his belief are as follows:

1. I have been a Special Agent with the ATF for over one year, during which time I have investigated state and federal firearms offenses, including firearms trafficking into the New York City area. The information set forth in this complaint is based on my own observations, interviews with other law enforcement officers and witnesses, and review of reports and recorded conversations. Conversations set forth in this complaint are set forth in sum and substance and in part.

2. Because the purpose of this complaint is only to establish probable cause to arrest, I have not set forth all the facts and circumstances of which I am aware.

3. On or about January 17, 2005, an undercover detective with the New York City Police Department (the "UC") met with the defendants JONATHAN RODRIGUEZ and JOSE OCASIO SR. in the vicinity of Evergreen Avenue and Wierfield Street in Brooklyn, N.Y. for the purpose of purchasing a firearm. The UC arrived at the location in an unmarked car and engaged the defendants in a

3

brief conversation regarding the gun purchase.  RODRIGUEZ then withdrew a black Rohm .22 caliber revolver and handed it to OCASIO.  OCASIO took the revolver and entered the UC's car.  Once inside the car, OCASIO handed the revolver to the UC.  The revolver was loaded with four rounds of ammunition.  RODRIGUEZ, OCASIO and the UC then discussed the price of the revolver and agreed upon a sum of $400, which the UC provided to OCASIO.  OCASIO and RODRIGUEZ exchanged contact numbers with the UC.  RODRIGUEZ and OCASIO told the UC that they would have more guns soon and would call the UC when the guns became available.

        4.  On or about January 31, 2005, the defendants JOSE OCASIO and GERALDO HUERTAS met with the UC in front of 369 Menhanan Street, Brooklyn, N.Y., for the purpose of purchasing additional firearms.  After the UC arrived at the location, HUERTAS stated that they should go inside the building.  The UC followed HUERTAS and OCASIO to the rear of the building and down a flight of stairs to the basement of 369 Menahan Street.  Once in the basement, HUERTAS removed a silver Charter Arms .38 caliber revolver from a shelf and handed it to the UC.  The UC examined the revolver and found that it was loaded with five rounds of ammunition.  The UC asked OCASIO and HUERTAS how much they wanted for the revolver and ammunition, and OCASIO replied that the revolver would be $500.  The UC handed $500 to OCASIO, who counted the money and gave a portion of the money to HUERTAS.  HUERTAS, OCASIO and the UC then engaged in a firearms-related conversation, during which HUERTAS stated that he was expecting

4

more guns and would contact the UC when he got them. OCASIO also stated that he could supply the UC with crack and/or cocaine.

     5. On April 18, 2005 at approximately 7:13 p.m., the UC received a telephone call from HUERTAS. In sum and substance, HUERTAS stated that he had a Hi Point 9mm pistol and offered it to the UC. HUERTAS stated that he wanted $750 for the gun and arranged to meet with the UC on April 19, 2005 at 369 Menahan Street. On April 19, 2005, the UC met with HUERTAS in the vicinity of 369 Menahan Street, Brooklyn, N.Y. HUERTAS entered the UC's car with a red plastic bag. HUERTAS and the UC engaged in a brief firearms-related conversation before HUERTAS stated that he did not feel comfortable "on the block." At HUERTAS's direction, the UC then drove to the corner of Grove Street and Wycoff Avenue in Brooklyn, N.Y. Once they arrived at the location, HUERTAS removed a shoe box from the red plastic bag. HUERTAS opened the shoe box and removed a Hi Point .380 caliber handgun loaded with eight rounds of ammunition, which HUERTAS handed to the UC. The UC negotiated with HUERTAS regarding the price for the firearm and HUERTAS agreed to a price of $700, which the UC handed to HUERTAS. HUERTAS and the UC engaged in a brief conversation, during which HUERTAS stated that he was a "Blood" gang member and that he would be getting more guns to do business with the UC. HUERTAS further stated that he would call the UC when he had more guns in hand.

     6. On April 24, 2005, the UC received two telephone calls from HUERTAS. In sum and substance, HUERTAS offered to

5

sell the UC a Tec-9 pistol for $1500. After some negotiation, HUERTAS agreed to sell the Tec-9 pistol to the UC for $1350. When the UC asked whether the weapon was "clean," HUERTAS stated "it's clean" and agreed to meet the UC on April 25, 2005 between 4:00 p.m. - 5:00 p.m. "on the block." Based on prior conversations with HUERTAS, the UC understood "on the block" to mean Menahan Street.

   7. On April 25, 2005, at approximately 5:10 p.m. the UC placed a telephone call to HUERTAS. In sum and substance, the UC asked whether HUERTAS still planned to sell him the Tec-9 pistol. HUERTAS stated "yes, can we hook up at 9:00?" The UC asked what happened, and HUERTAS replied that "my guy is stuck." HUERTAS assured the UC that the deal was "for sure" and the UC agreed to call HUERTAS later that evening. At approximately 8:52 p.m., the UC placed another telephone call to HUERTAS. In sum and substance, HUERTAS stated that the deal was "dead for tonight" and assured the UC that they could complete the transaction the following day. The UC asked HUERTAS what happened, and HUERTAS replied "my guy lives in Staten Island and he's stuck for today." HUERTAS promised to call the UC the next day.

   8. On April 26, 2005 at approximately 4:20 p.m., the UC received a telephone call from an individual who identified himself as "Rush." In sum and substance, "Rush" asked the UC whether the UC was coming by to pick up the Tec-9 pistol. After the UC asked "Rush" who he was, "Rush" stated "you picked up a

.38 from the basement in Menahan." The UC responded "Oh, with Jay" [referring to HUERTAS]. "Rush" then stated "I was with Jay. People call me Rush." "Rush" further stated that he was just checking to see whether the UC was picking up the Tec-9 pistol. The UC told "Rush" that he would be by to pick up the gun around 8:00 p.m. At approximately 4:34 p.m., the UC placed a telephone call to HUERTAS. In sum and substance, the UC asked whether HUERTAS had provided the UC's number to "Rush." HUERTAS stated: "Yes, everything's good. He just wanted to make sure you wanted that." The UC told HUERTAS he would be by at 8:00 p.m. to pick up the Tec-9 pistol.

        9. On April 26, 2005 at approximately 8:25 p.m., the UC met with HUERTAS in front of 371 Menahan Street, Brooklyn, N.Y. HUERTAS and the UC engaged in a firearms-related conversation. HUERTAS stated that he had to go inside to get the gun, but instructed the UC to give "Rush" $1150 and then give HUERTAS $200 when the transaction was completed. The UC followed HUERTAS into the lobby of 371 Menahan Street where "Rush" was waiting with a black gun case. "Rush" handed the gun case to HUERTAS, who opened the gun case and removed an Intratec Model Tec-9 9mm semi-automatic pistol. HUERTAS handed the Tec-9 pistol to the UC, who checked the firearm and found it to be loaded with a full magazine of 25 9mm rounds. The UC placed the Tec-9 pistol back into the gun case and handed "Rush" $1150. The UC then left the lobby with HUERTAS. The UC placed the Tec-9 pistol inside the UC's car and then handed HUERTAS $200.

10.   On or about June 5, 2005, the UC received a telephone call from HUERTAS.  In sum and substance, HUERTAS offered to sell the UC a .380 caliber handgun for $650.  HUERTAS and the UC agreed to meet the next day "by the block."  On June 6, 2005, at approximately 12:55 p.m., the UC received a telephone call from HUERTAS.  In sum and substance, HUERTAS asked the UC whether the UC was still coming to get the ".380."  The UC replied "yes, I should be there three to four o'clock" and HUERTAS stated that he would "be on the block."  Later the same day, HUERTAS and the UC met in the vicinity of 369 - 371 Menahan Street, Brooklyn, N.Y.  Once at the prearranged meeting spot, the UC purchased a Hi Point .380 caliber handgun from HUERTAS for $650.

11.   On or about June 15, 2005, the UC received a telephone call from HUERTAS.  In sum and substance, HUERTAS offered to sell the UC a Mac-10 pistol with a 30 round clip.  The UC stated that "I could use that.  I am also looking for an ounce of crack."  HUERTAS told the UC: "No problem, I always sell that."  The UC the asked HUERTAS how much it would be for the Mac-10 pistol and the ounce of crack.  HUERTAS and the UC agreed on a price of $2600 for the firearm and crack and agreed to meet the following day to complete the transaction.

12.   On June 16, 2005, the UC met with HUERTAS and "Rush" in front of 371 Menahan Street, Brooklyn, N.Y.  After the UC arrived, "Rush" went inside the building and returned with a yellow plastic bag, which he handed to HUERTAS.  HUERTAS took the

yellow plastic bag, entered the UC's car, and told the UC to drive around the block. At HUERTAS's direction, the UC drove to the vicinity of Grove Street and Wycoff Avenue, Brooklyn, N.Y. Once at the location, HUERTAS handed the yellow plastic bag to the UC. The UC checked inside the yellow plastic bag and removed a shoe box, which contained a plastic bag containing a rock-like substance that appeared to be crack cocaine and a 9mm SWD pistol with a defaced serial number. After checking the items, the UC handed HUERTAS $2600. The rock-like substance provided to the UC by HUERTAS tested positive for cocaine base and the total net weight was approximately 21 grams.

13. According to federal firearms records, neither the defendant GERALDO HUERTAS, nor the defendant JOSE OCASIO SR., nor the defendant JONATHAN RODRIGUEZ is licensed to import, manufacture, or deal in firearms.

14. A criminal records check revealed that the defendant GERALDO HUERTAS was convicted of, among other crimes, criminal possession of a weapon in the third degree, a Class D felony, in Kings County Supreme Court on or about February 2, 2004.

15. Based on my conversations with an interstate nexus expert, I know that all of the firearms sold to the UC by the defendants GERALDO HUERTAS, JOSE OCASIO SR., and JONATHAN RODRIGUEZ were manufactured outside of New York State.

WHEREFORE, your deponent respectfully requests that arrest warrants may be issued for the defendants GERALDO HUERTAS,

9

also known as "Big Jay," JOSE OCASIO SR., also known as "Lil Jay," and JONATHAN RODRIGUEZ, also known as "Mil," so that they may be dealt with according to law. Your deponent also requests that this affidavit and the arrest warrants for the defendants be sealed, except that ATF may disclose this affidavit and the arrest warrants as necessary to effectuate the arrest and arraignment of the defendants.

MICHAEL PARTEN
Special Agent
Bureau of Alcohol, Tobacco,
Firearms, and Explosives

Sworn to before me this
12th day of February, 2007

UNITED STATES MAGISTRATE JUDGE
EASTERN DISTRICT OF NEW YORK